## HARLIN BROYLES v. STATE.

No. A-10695.   Oct. 3, 1946.

(173 P. 2d 235.)

Writ of Certiorari Denied Dec. 9, 1946. See 67 S. Ct. 358.

84

Walter Billingsley, of Wewoka, and George L. Hill, of McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Haskell A. Holloman, Asst. Atty. Gen., and Bill Biggers, Co. Atty., and Hubert Hargrave, Asst. Co. Atty., both of Wewoka, for defendant in error.

JONES, P. J. The defendant, Harlin Broyles, was charged in the superior court of Seminole county by information with the crime of murder, was tried, convicted and sentenced to death, and has appealed.

It is alleged that the defendant shot and killed Eric Nicholson, a deputy sheriff of Seminole county, while the deceased officer was attempting to take the defendant to the police station in the city of Seminole on January 10. 1945, about 5 p.m., for questioning in connection with the alleged possession by the defendant of a forged check.

The proof of the state showed that about 4 p. m. on January 10, 1945, the defendant appeared at a store operated by C. P. Roberts, and sought to purchase a pistol which was laying in the window of the store. He presented a check purportedly signed by A. S. Wells of Seminole, but Mr. Roberts refused to accept the check and the purchase was not made. The defendant reappeared at the store again in about half an hour and again sought to purchase the pistol. At that time he remained in the store about ten minutes. His actions aroused the suspicions of Roberts and Rev. S. W. Nesmith, a customer of the store, who notified the officers immediately after the defendant had left. The deceased, Eric Nicholson, and another officer, Ode Lewis, went to Roberts' store in response to the call and were giv-

en a description of the man who had attempted to pass the check.

The witness Roberts testified that he walked out on the street with the deceased, and in a few minutes they were able to locate the defendant standing in front of a theater. The deceased went up to the defendant and said, "Come on, I want to talk to you," and they started walking south toward the police station. When they had almost arrived at the police station, various witnesses testified that they saw the defendant jerk loose from the officer and start backing up. That defendant had on a leather jacket and pulled a gun out of the leather jacket, and, as the officer started toward him, the defendant fired two shots, one of which struck the deceased in the heart, killing him almost instantly.

Immediately after the shooting, the defendant fled down an alley, through a freight depot, across some railroad tracks to a water pump station operated by the city of Seminole. At that point, he forced two employees of the city, Bill Adams and Wallace Smith, to get into the Adams car with him and drive west to the Bowlegs highway. When they reached the highway, Smith jumped from the car and ran. The defendant then forced Adams to drive south toward Bowlegs city. Adams continued to drive the car until it ran out of gas at a point west of Bowlegs. The defendant continued to keep Adams with him for some time in the woods. Early in the night they walked to some houses owned by the Gulf Oil Company where the defendant stole an automobile and forced Adams to drive it. The lights were not working, and they abandoned this car and later stole another automobile which he likewise forced the witness Adams to drive. During the defendant's

travels with Adams that night, he stopped and stole a mackinaw coat out of the car of a Mr. Gilley. After Adams had been with the defendant about five hours, the defendant released him on a section line not far from the Harjo community. The defendant in the meantime stole a pair of overalls off a clothes line from a man named McVay.

The proof further showed that prior to the killing, and on January 7, 1945, the defendant, under the name of George McDaniel, appeared in Shawnee, Okla., and rented a room, telling the landlady that he was an under-cover man working for the government. The landlady testified that on the night of January 10, 1945, the defendant did not occupy his room, but that he came to Shawnee the next morning, January 11th; that his actions were very suspicious, and the landlady told him to leave the following day. The defendant was not heard from again until about February 2, 1945, when he was stopped by a policeman in Waco, Tex., for questioning. The defendant at that time told the policeman that he was farming at San Angelo. When asked to show his draft card, the defendant produced a card made out to George McDaniel, Route 1, Granby, Missouri, and said that his name was George McDaniel. After questioning him further, the policeman started with the defendant toward the police station. When they were within about a block of the police station, the defendant pulled a gun and fired two shots, one of which went into the officer's stomach and another one penetrated his little finger. The officer was not killed, but was able to draw his gun and shot the defendant, wounding him sufficiently that he was captured by some bystanders at that place. When the defendant was searched, the officers found a small address book in which were written the names of three attorneys living at Seminole, Oklahoma, including

the name A. S. Wells, which was forged to the check allegedly presented by defendant to C. P. Roberts; also the name First State Bank of Seminole was written in the address book. The officers then searched the room where the defendant said he had been staying and found a suitcase with the name George McDaniel thereon. In the suitcase were some clothing and several shells of different caliber. Also in the suitcase was a letter addressed to George McDaniel, 230 North Bell, Shawnee, Oklahoma, which was mailed from Topeka, Kansas, on January 9, 1945. The officers also found in the billfold of defendant two Social Security cards, one of which was made out to George Harvey McDaniel and the other to George Eugene Mason.

The defendant under questioning by the officers at that place admitted that he had formerly been living at 230 North Bell in Shawnee, Oklahoma, and that the letter was from a girl friend at Topeka. The Waco officers then communicated with officers in Oklahoma, and two carloads of people who had seen the defendant at the time of the shooting or shortly before, and including one of the men, Bill Adams, who was kidnapped after the shooting, went to Waco and positively identified the man as the one who had killed Officer Nicholson.

The defendant told the officers that he had been visiting some with his parents at McCamey, Tex. The officers then went by his parent's place and recovered the mackinaw coat which the defendant had stolen from Mr. Gilley while he was fleeing after the shooting with Adams.

At the time of the trial the defendant was positively identified by ten witnesses as being the man who killed Officer Nicholson and fled after kidnapping Adams and Smith. The landlady, and other parties who saw the defendant at the rooming house at 230 North Bell street in

Shawnee, identified defendant as being the George Mc-Daniel who stayed there for one week. The overalls which the defendant had stolen from the witness McVay were found in his room at 230 North Bell street in Shawnee and were identified at the trial by McVay. The witness Gilley also identified the mackinaw coat which was stolen from him the night of January 10th and which was recovered by officers at the home of defendant's parents in Texas. There were many details of evidence supplied by the various witnesses for the state which conclusively showed the defendant's guilt.

The defendant did not testify.

The first assignment of error is that the information filed against the defendant contained an allegation of a prior conviction of defendant of a felony, and that the court erred in allowing the county attorney to read such information with such allegation to the jury.

Counsel for defendant contend that the county attorney erroneously included an allegation of a prior conviction in the information filed against the defendant, and that the trial court erred in allowing the county attorney in his opening statement to the jury to read the information containing therein the allegation of the prior conviction.

In Johnson v. State, 79 Okla. Cr. 71, 151 P.2d 801, this identical question was presented to us. It was therein held:

"Habitual criminal statute, Penal Code, art. 6, sections 1817 and 1818, O. S. 1931, 21 Okla. St. Ann. §§ 51 and 52, does not create or define a new or independent crime, but describes circumstances wherein one found guilty of a specific crime may be more severely penalized because of his previous conviction, as alleged and found. 'Habitual criminality' is a state and not a crime.

"In order to subject an accused to the enhanced punishment for a subsequent offense, it is necessary to allege in the indictment or information the fact of a prior conviction or convictions, in order that defendant may be clearly informed of the charge he is called upon to meet.

"In a prosecution seeking an enhanced punishment for a second or subsequent offense, the burden is upon the state to prove the prior conviction or convictions beyond a reasonable doubt.

"Habitual criminal statute authorizing increased punishment for subsequent conviction should not be used by prosecution in capital felonies, unless it is clear that the Court must charge the jury on some included offense, because there can be no cumulative punishment in a capital case, and statute should not be used to prejudice an accused on trial for his life by admitting evidence of distinct offenses which tend to show the bad character of the accused.

"Trial court may admit evidence of former conviction in murder prosecution where plea of self-defense is interposed and evidence of state shows that included offense of manslaughter in the first degree must be submitted to the jury, provided said prior conviction is charged in the information."

At the time the county attorney read the information to the jury, no objection was interposed by counsel for defendant. The record also discloses that at the time of the arraignment of the defendant, a plea of not guilty was entered for him without any objection being interposed to that part of the information alleging the prior conviction.

In Johnson v. State, supra, it is stated:

"The issue could have been raised by motion to strike the allegation of a second offense at the time of the arraignment of the accused, or by objection to the introduction of evidence as to the former conviction during the trial."

The record discloses that just before the state closed its case, counsel for the state offered in evidence the information, judgment and sentence filed in the superior court of Clay county, Missouri, against the defendant, to which offer the defendant's counsel objected and the objection was sustained by the court. It is apparent that at that point in the trial, the judge had determined that the defense was in the nature of an alibi, and that the verdict of the jury would necessarily be that of guilty of murder or nothing, and that the question of enhanced punishment in case of a conviction for manslaughter had no place in the proceedings. However, the county attorney did not know at the time the information was filed whether the defendant would interpose a plea of self-defense, as many of the state's witnesses testified that there was a "scuffle" or "struggle" between the defendant and deceased at the time the shot was fired. As the defendant did not testify at the time of the preliminary examination, the county attorney did not know at the time the information was filed whether a plea of self-defense would be made on behalf of defendant which would inject the issue of manslaughter in the first degree.

Attention is further directed to the fact that the only time counsel for defendant interposed an objection to any matter pertaining to the question of the prior conviction of defendant, the objection was sustained.

Also we have observed that in instruction No. 12, the trial court stated to the jury:

"* * * Nor shall you consider for any purpose any evidence offered and by the court rejected or which has been stricken by order of the court. Such evidence is to be treated as though you never heard it."

It is next contended that the court erred in permitting the state over the objection of defendant to ask certain questions of the jurors on their voir dire examination.

One hundred twenty-five pages of the record are devoted to the examination of the jurors. Counsel for both the state and the defendant closely questioned each prospective juror. The record further discloses that each time objection was interposed to the form of question asked by counsel for the state that such counsel withdrew the alleged objectionable question. The three principal questions to which this proposition is directed as shown by the record are as follows:

"Q. Do you know of any reason if selected as a juror and your solemn duty imposes upon you the passing of death—a verdict of death in this case, why you would not make a fair and impartial juror? A. I do not. Mr. Hill: I believe I will object to that question, because it is not in compliance with the statute. By Mr. Bishop: We will withdraw the question. The Court: All right. * * * Q. Mr. Davis, in this case you have heard the statement to your brother jurors, Mr. Mayfield, and others, that the State of Oklahoma is asking for the extreme penalty? That is, death in the electric chair? By Mr. Hill: Now, I think we want to object to the statement of plaintiff's counsel that Oklahoma is asking for this, that and the other. The State of Oklahoma prosecutes this case, but the State of Oklahoma guarantees to every man a fair and impartial trial, and asks that they be acquitted if the evidence justifies that kind of verdict just the same as they do or they may convict on the other hand. Now he is representing the State of Oklahoma as the county attorney, and they say that they will ask for that, but the State of Oklahoma doesn't request anything only a fair trial in the trial of this case. The Court: All right. By Mr. Bishop: We will change the wording of the question, if Mr. Billingsley objects. The Court: All right. Q. And we will withdraw it. Thank you, Walter. The Court: All right. * * * Q. But

once, if convinced beyond a reasonable doubt that the evidence and the facts justified the infliction of the death penalty, can you, acting as a courageous man and your duty as a juror return into this court room a verdict carrying with it the sentence of death? A. Mr. Hill: I don't think that is a proper question, and I object to it. By Mr. Bishop: I will withdraw the question. Mr. Hill: I don't think this is a proper question. By Mr. Bishop: We will withdraw the question. Thank you, Mr. Hill. The question may be withdrawn. I will try to state it as Mr. Hill wants it stated."

The record discloses that throughout the voir dire examination objections were interposed by counsel for defendant only six times, and that in each of these instances the questions were withdrawn and reframed. In no instance was the trial court called upon to pass upon the objection of counsel for defendant.

This court has many times discussed what are proper questions to be asked a juror in determining whether he entertains conscientious scruples against the infliction of the death penalty. In McDonald v. State, 54 Okla. Cr. 161, 15 P.2d 1092, 1094, it is said:

"In a capital case, in ascertaining whether a juror entertains conscientious scruples against the death penalty, he may be asked if in a case where the law and the evidence warrants he could, without doing violence to his conscience, agree to a verdict for the death penalty. When the prosecution goes beyond that, the court should limit the question and particularly so when objection is made. But counsel for a defendant may not rest on a mere objection and exception if he is of the opinion that by such question and answer a juror is biased, or prejudiced or not fair and he is not satisfied with him, he must challenge for cause if of the opinion ground for such challenge exists, and, if not, he must exercise the right given him by statute to exclude the juror by peremptory challenge. If counsel believes any juror was pledged to return a verdict

imposing the death penalty, under the circumstances named, he should have purged the jury by challenge."

Counsel for the state has further called our attention to the fact that no exceptions were taken or preserved to these alleged errors. It was not set up as an assignment of error in defendant's motion for a new trial nor mentioned in the petition in error. Under such circumstances, such assignments of error may not be considered on appeal. Mills v. State, 73 Okla. Cr. 98, 118 P.2d 259.

However, in capital cases where the death penalty has been invoked, this court has been liberal in considering any assignments of error so as to determine whether the accused has been fairly convicted. We have accordingly considered this question raised by counsel and have come to the conclusion that there is no error in the conduct of counsel for state in the questions asked by them on voir dire examination. Attention is further directed to the fact that at the time the last juror was called to the box for examination, counsel for the defendant said, "We are satisfied with the jury."

It is next insisted that the court erred in admitting the evidence of the shooting of the police officer at Waco, Tex., for the reason that such shooting was a separate offense, was not a part of the res gestae and was prejudicial to the defendant.

This court has many times said that evidence of flight of defendant and the circumstances surrounding his arrest are admissible even though such actions might show him guilty of another offense.

In Cox v. State, 25 Okla. Cr. 252, 220 P. 70, it is said:

"Evidence that the defendant, at the time he was arrested, was armed, resisted arrest, and attempted to escape, is competent, and the admissibility of such evidence is not

affected by the fact that incidentally it tended to prove the defendant guilty of other offenses."

In the body of the opinion it is stated:

"The evidence of the possession of the revolver, which answered the description given by the prosecuting witness, and of the search light, which also answered the description given by the prosecuting witness, and of the description of the clothing worn by the defendant at the time of his arrest, which also answered the description given by the prosecuting witness, were all admissible on the question of the identity of the defendant with that of the man who committed the robbery. The evidence of his attempted escape from arrest and resistance to arrest were provable as indicating a consciousness of guilt on his part, and the admissibility of this evidence was not affected by the fact that it tended to prove the defendant guilty of other offenses. Hill's Criminal Evidence, 54, 115, and 118; Robinson v. State, 8 Okla. Cr. 667, 674, 130 P. 121; Vickers v. United States, 1 Okla. Cr. 452-462, 98 P. 467."

In Bouyer v. State, 57 Okla. Cr. 22, 43 P.2d 153, 154, this court held:

"The testimony of officers detailing the steps taken in searching for and arresting the defendant is admissible for the purpose of proving his flight. * * *

"Evidence which is relevant to the issue is not rendered inadmissible by reason of the fact that it tends to prove the defendant guilty of an offense other than the one charged in the information."

The arrest of the defendant at Waco, Tex., and the evidence uncovered in connection with the search of defendant and his suitcase revealed several corroborative bits of evidence. They showed that defendant was going under the name of George McDaniel, which was the same name used by him at Shawnee. He had in his possession an address book bearing the name of A. S. Wells and two other people of Seminole and the First State Bank of

Seminole. Since defendant contended to the officers at the time of his arrest that he had never been in Seminole, the possession by him of this address book with the names of the Seminole residents and their addresses set forth therein was competent evidence directly connecting him with the offense charged.

In the early case of Almerigi v. State, 17 Okla. Cr. 458, 188 P. 1094, it is held:

"Flight from the scene of a crime and acts done by a fugitive to hide his identity are circumstances tending to show guilt, and proof of them is admissible in evidence."

In Quinn v. State, 52 Okla. Cr. 81, 2 P.2d 970, this court stated:

"The main contention is that the court erred in permitting the state to offer testimony of the difficulty in the elevator. The state insists this evidence was admissible as showing an attempt to escape. Evidence of resistance to arrest, flight, escape or attempt to escape, is generally held admissible as showing a consciousness of guilt. The presumption arising from such conduct may be rebutted, and it is for the jury to say whether or not the conduct is due to a consciousness of guilt. 1 Wig. on Ev. 276; People v. Talbe, 321 Ill. 80, 151 N.E. 529; Cox v. State, 25 Okla. Cr. 252, 220 P. 70. The surrounding facts and circumstances in this case render this evidence competent. Unexplained as it was, the jury must have believed the attempt to use the pistol was in an attempt to escape."

In the case of Littrell v. State, 21 Okla. Cr. 466, 208 P. 1048, 1050, the defendant was charged with the crime of bank robbery. At the trial the court admitted evidence that several days after the robbery the defendant was discovered and surrounded by officers and that he fired several shots at the officers and wounded a deputy sheriff. In disposing of defendant's contention that this evidence was inadmissible, it was stated:

"Certainly this flight, resistance to arrest, and escape on the part of the defendant was admissible in evidence, as a circumstance indicative of guilt, and this notwithstanding the fact that he committed another crime in so resisting arrest. Jones on Evidence, 287, states the law as follows: 'Thus flight, * * * attempt to escape, resistance to arrest, are all facts which may tend to show consciousness of guilt, and are in common practice received in evidence as relevant.' "

Lastly, it is contended by the defendant that the court committed error in not instructing the jury as to the purpose in admitting the evidence concerning the arrest and attempt to escape of the defendant at Waco, Tex. No requested instruction was submitted by counsel for defendant, and no exception was saved to the giving of any instruction. We think the court in the absence of any request for further specific instruction on this question sufficiently stated the law in instruction No. 11 as follows:

"The flight of a person accused of crime, or his acts in avoiding the officers, may indicate his consciousness of guilt of the offense, or such act or conduct may not indicate consciousness of guilt, depending upon the circumstances of the case. If you find that there was any such flight by the defendant in this case, then you may consider the circumstances thereof, and the defendant's explanation thereof, and from all the facts and circumstances you may give to this evidence and these circumstances such weight and value as evidence as you deem proper."

In Green v. State, 70 Okla. Cr. 228, 105 P.2d 795, 797, this court held:

"The Code of Criminal Procedure provides the method of procedure for requesting instructions, and a defendant may submit to the court written instructions with the request that they be given, and how objections and exceptions shall be reserved. Secs. 3057, 3079, 22 Okla. St. Ann. 831, 856.

"It has been repeatedly held by this court that it is the duty of counsel for a defendant, where he is of the opinion that additional instructions should be given, to reduce them to writing, and request that they be given. If he fails to do so a conviction will not be reversed, unless the court is of the opinion, in the light of the entire record, and instructions of the court, that there was a failure to instruct upon some material question of law, and that the defendant has been deprived of a substantial right. Lee v. State, 67 Okla. Cr. 283, 94 P.2d 5; Pulliam v. State, 61 Okla. Cr. 18, 65 P. 2d 426; Adams v. State, 62 Okla. Cr. 167, 70 P.2d 821; Russell v. State, 17 Okla. Cr. 164, 194 P. 242; Williams v. State, 12 Okla. Cr. 39, 151 P. 900."

We have given this case that careful consideration and attention which its importance demands. We can perceive no errors in the proceedings before the trial court. Counsel for the state are to be commended upon the painstaking care with which they presented their evidence against the defendant. It shows that careful attention was given to procure all evidence that might be available as bearing on the guilt of the accused. Counsel for defendant made a strong and vigorous fight for their client, but the evidence of his guilt as presented by the state was so overwhelming that no reasonable person with any regard for his oath as a juror could have come to any conclusion other than that the defendant was guilty of murder as charged in the information.

There is some contention made in the brief that the punishment should be modified to life imprisonment. With this we cannot agree. The evidence shows that the defendant is a cold-blooded, wanton killer, wholly without regard for human life. The infliction of the death penalty is the only proper punishment to be meted out to such an individual in cases such as presented by this record.

The judgment of the superior court of Seminole county is therefore affirmed.

The date originally appointed for the execution of the defendant Harlin Broyles having passed pending this appeal, it is ordered, adjudged and decreed by this court that the judgment and sentence of the superior court of Seminole county be carried out by the electrocution of the defendant Harlin Broyles by the Warden of the State Penitentiary at McAlester, Oklahoma, on Tuesday, December 31, 1946.

BAREFOOT and DOYLE, JJ., concur.