## WILSON v. STATE.

No. A-11632. Nov. 5, 1952.

(250 P. 2d 72.)

138

W. G. Long and J. B. Gilbreath, Ada, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, Charles C. Wilson, was charged in district court of Pontotoc county with the crime of murder, allegedly committed on January 11, 1951, by assaulting one James Myers with a large pocket knife and stabbing and cutting the said James Myers with said knife until the defendant caused Myers' death; was tried, convicted of manslaughter in the first degree and pursuant to the verdict of the jury was sentenced to serve seven years imprisonment in the penitentiary, and has appealed.

The undisputed evidence showed that defendant Wilson and the deceased Myers were unmarried young men who had been close personal friends for many years. On the night of the homicide they, together with Myers' girl·friend, Corine Huffman, were engaged in drinking beer at the town tavern in Ada.

The state's proof showed that during the evening defendant asked Myers to lend him $3 and Myers stated that he did not have the money. Later Myers handed a $20 bill to Corine Huffman and directed her to pay for some beer which the three had drunk. The defendant Wilson then accused Myers of lying when he said he did not have $3 to lend him. The argument became quite heated and Wilson left the group temporarily and sat at a nearby counter. In a few minutes the argument started again and a recruiting sergeant for the Marines directed them to go outside and settle the argument. On the outside several blows were struck and apparently the deceased was whipping the defendant. Myers

struck the defendant some severe blows on the head .and had knocked him down and was on top of him. The defendant had a jackknife with a blade about four inches long. During the struggle he pulled this knife and slashed deceased three times. One of the wounds so inflicted was a stab into his heart, which caused his death a few minutes later. At the time the blows from the knife were struck the parties were rising to their feet and when Myers was struck by the knife he slumped and fell over. The defendant left with .some boys in an automobile, went home and was in bed when he was arrested a short while later by the officers.

The defendant testified that the argument in the tavern started over $5 that the deceased owed him; that the deceased and his girl friend had a quarrel and the deceased struck her a time or two; that the house man threw the whole bunch out the back door, and just as he went out the door some one hit him in the back of the head. Then he was struck two more licks, knocking him into a car; that some one was on top of him giving him a severe beating when he blacked out; that he did not remember anything after that blow was struck. After he came to he was in an automobile -with three Indians and his nose was bleeding severely and he had several scratched places about his face. The Indians let him out of the car near the milk plant and he walked home. The next day while he was in jail he was taken to a Doctor for treatment. He had several severe bruises and scratches on him and his nose was broken; that he did not remember striking anybody with a knife.

The officers verified the story related by the defendant as to his physical appearance after the fight. The Doctor who treated him also stated that he had sustained a fractured nose and other lesser injuries.

The defendant through his counsel has presented many assignments of error in his brief. In the opinion of the court there are only two of these assignments of error which are of sufficient merit to require a reversal of the case. It is contended that the trial court committed reversible error in submitting instructions Nos. 19 and 15 to the jury. Instruction No. 19 reads:

"You are instructed that flight, when unexplained, is a circumstance tending to prove consciousness of guilt, and when taken· in connection with all the other evidence in the case, its significance is to be determined by the jury; and *you may consider the flight of the defendant in connection with all the other facts and circumstances in evidence in determining the defendant's guilt or innocence.*" (Italics ours.)

The Court erred in this instruction. Witnesses for the state testified that immediately after the altercation defendant walked to the automobile of Charles Price and sat down. Later he got out of this automobile and entered another automobile and left the scene of the difficulty. The officers testified they arrested him a short while later at his home while he was in bed. Defendant testified that he blacked out during the altercation and when he came to his senses he was near the Ada milk plant in an automobile; that he saw that his nose was bleeding and was hurting and asked to be let out of the car; that he then went home and went to bed not knowing who had caused his injuries; that he had no recollection of striking the deceased or of leaving the scene of the difficulty.

This court has held in many cases that evidence of flight, concealment and analogous conduct is admissible as evidence because it is a circumstance tending to show consciousness of guilt. Littrell v. State, 21 Okla. Cr. 466, 208 P. 1048; Colglazier v. State, 23 Okla. Cr. 23, 212 P. 332; Compton v. State, 74 Okla. Cr. 48, 122 P. 2d 819; Broyles v. State, 83 Okla. Cr. 83, 173 P. 2d 235.

However, the error of the court consists in his assumption that the defendant fled from the scene of the difficulty. The evidence of the state tending to show

a flight was very weak. Counsel for the accused contended that there was no evidence at all even showing in the slightest degree that defendant fled from the scene of the difficulty. We cannot agree that there is a total absence of any evidence showing a flight, but the most that can be said of the state's case is that the evidence presented an issue of fact for the determination by the jury as to whether the defendant fled from the scene of the crime under a consciousness of guilt in order to evade arrest and detection.

In the case of Sprouse v. State, 52 Okla. Cr. 184, 3 P. 2d 918, this court stated:

"It is argued that the instruction assumes defendant fled. The instruction complained of is somewhat involved. In the first sentence it appears to assume that defendant fled; in the latter part it appears to leave the question to the jury. The instruction, in the form in which it appears, is erroneous, and should not have been given. Where there is evidence of flight which is denied or what appears to be a flight is explained, the court, if it instructs on the matter of flight, should be guarded in its language and not assume the conduct of accused is a flight. Robinson v. State, 8 Okla. Cr. 667, 130 P. 121; Cox v. State, 25 Okla. Cr. 252, 220 P. 70; Bruner v. State, 31 Okla. Cr. 351, 238 P. 1000".

In Bruner v. State, 31 Okla. Cr. 351, 238 P. 1000, it was held:

"Flight of a defendant is a circumstance tending to prove guilt, and where the state offers evidence of the conduct of defendant tending to prove flight, and the defendant offers evidence in explanation of such conduct, it is proper to submit the question of flight to the jury as a matter of fact for their determination, and to instruct them that, if they find beyond a reasonable doubt that the defendant fled, it may be considered as a circumstance tending to prove guilt."

A case with great similarity to the case at bar is Lunsford v. State, 53 Okla. Cr. 305, 11 P. 2d 539. That case was reversed because of an erroneous instruction upon the question of flight. This court there held:

"The question of flight is one of fact and not of law, and, where the question is controverted, the court in its instructions should not assume that defendant fled, but if any instruction upon the question of flight is given, it should be submitted to the jury as a question of fact."

In the case of Compton v. State, 74 Okla. Cr. 48, 122 P. 2d 819, 821, supra, flight was defined as follows:

"The term signifies, in legal parlance, not merely a leaving, but a leaving or concealment under a consciousness of guilt and for the purpose of evading arrest. Such consciousness and purpose is that which gives to the act of leaving its real incriminating character." See, also, 22 C.J.S., Criminal Law, § 625.

The court should first define flight in his instructions to the jury. After giving this definition the court should give a further instruction in substantially the following language:

"Evidence has been introduced relative to the departure of the defendant after the alleged assault had occurred. You are instructed that you must first determine whether or not the actions of the defendant constituted flight. In this connection you are told that you may consider all the facts and circumstances before you, including the defendant's explanation of his departure from the scene of the difficulty, and if after a consideration of such evidence you are convinced beyond a reasonable doubt that the defendant fled after the alleged assault occurred then such flight is a circumstance that may be considered by you with all the other facts and circumstances in evidence in determining the question of his guilt or innocence."

See Compton v. State, 74 Oka. Cr. 48, 122 P. 2d 819, supra; Broyles v. State, 83 Okla. Cr. 83, 173 P. 2d 235, supra.

Instruction No. 15 to which objection was interposed by the defendant reads:.

"In this connection, you are instructed that if you do find that James Myers, at the time· of the fatal difficulty, made an attack, or threatened attack, upon the defendant, and should you further find, beyond a reasonable doubt, that in resisting such attack, or threatened attack, it was *not* necessary for the defendant to cut and stab the said James Myers, and that from the nature of such attack, or threatened attack, and under all the facts and circumstances as shown by the evidence it did *not* reasonably appear to the defendant that it was necessary to cut and stab the said James Myers to prevent death or serious bodily injury to himself at the hands of the said James Myers, and that under such conditions he then cut and stabbed and killed the said James Myers, the defendant would be guilty of manslaughter in the first degree, as hereinbefore instructed, and it will be your duty to so say by your verdict; unless you should find that the killing was justifiable, or have a reasonable doubt thereof, in which case you should acquit the defendant." (Italics ours.)

The use of the double negative in this instruction might have confused the jury and caused them to place an undue burden upon the accused.

The court gave thirteen instructions pertaining to the law of self-defense. There was very little, if any, evidence of self-defense. The defense interposed by the accused consisted in his contention that he was struck a severe blow on the head causing him to lose consciousness, and that he had no recollection or knowledge of being in a fight after such licks were struck him. In this connection he testified as follows:

"A. I went and asked him for the five dollars and he stated that he didn't owe me any money—said he didn't 'owe me any damn money' is the way it was and I says, 'You do owe me five dollars' and this girl had the money and he told me it was her money which she gave it back to him and I told him there was no need of having trouble that we would settle that some other time, well, I went and moved up to the counter and was sitting down with Jimmy Don Wilmouth and George Fike and them, and the next thing I knew the house man was throwing us out or putting us out, there was a whole bunch of us, about four or five of us, and Lefty and Corine had had a lick or two in the back and they were putting us out and when I went out the door someone hit me in the back of the head on the left side just as I went out the last door—there is three doors, there is one after you leave the main part of it; and then the second one and then the third one, and when I went out the third one someone hit me and knocked me into a car and I fell and someone was on me beating me and I asked them to pull him off and no one pulled him off and he kept beating me and that is all I know, I just 'Blacked out' passed out, and that is all I know about it. Q. Did you know who was fighting you? A. I couldn't swear to that, sir; all I know was someone was hitting me and had me down beating me but I couldn't swear who it was. * * * Q. Did you have a knife at that time? A. No. sir. Q. Do you remember getting the knife, or anything? A. No, sir."

Counsel for the accused attempted to inject an element of self-defense into. the case by asking the following question:

"If you did use that knife, if you used it at all, would you have used it except you thought that you were in imminent peril of losing your life—."

However, the court sustained the objection to such question on the ground that it was leading and counsel did not further pursue that line of questioning.

On cross-examination he testified as follows:

"Q. When did you 'Black out'? A. When someone had me down beating me. Q. And how long had they had you down? A I couldn't say. Q. Now, you said awhile ago you called to somebody to pull him off? A. That is right. Q. You weren't 'Blacked out' then, were you? A. No, sir, I 'Blacked out' afterwards. Q. You say now you don't remember now of ever pulling your knife out? A. That·

is right, sir. Q. And don't ever remember cutting the boy? A. That is right. Q. Where did you go after you got up? A. I don't know where all I went to, I was in a car when I came to, sir, down by the Ada Maid milk plant."

The only time that the issue of self-defense was injected into the case was when the county attorney as a part of the cross-examination of the accused introduced in evidence a written statement given by the defendant to the officers the day following the homicide. In this statement the defendant said in response to questions by the county attorney:

"Q. You didn't see him attempt to use a knife on you or anything? A. No. Q. And you didn't think he was going to shoot you or anything like that? A. No, I didn't think that but he would have beat me to death. Q. He was getting the best of the fight? A. Yes, I was afraid of him. Mr. Gaar: What had made you afraid of him? A. He was a pretty good boy—I mean he was pretty strong. Q. You mean he was stout or lived pretty rough? A. He is stout and I had my back hurt and I wasn't in any shape to do anything. Mr. Mowdy: But you weren't afraid of getting killed? All you were afraid of was getting beat up pretty bad? A. I didn't know what would happen."

After the prosecutor injected this statement into the evidence and cross-examined the defendant in regard to it, it then probably became incumbent upon the court to give some instruction on the law of self-defense, but if this written statement by the accused had not been introduced in evidence there would have been no basis in the record for the giving of any instruction pertaining to self-defense, because that was not the defense relied upon by the defendant. In the retrial of this case instruction No. 15, above copied, should be eliminated and if the issue of self-defense is presented by the evidence, the court should carefully consider the other twelve instructions which he gave pertaining to the law of self-defense and eliminate those which are repetitious or which cover substantially the same matter as is related in the other instructions.

Counsel for the accused strenuously contend that the argument of the county attorney to the jury was improper, but a careful consideration of the argument complained of convinces us that the prosecutor was not expressing his personal opinion as to the guilt or innocence of the accused, but was relating to the jury what he thought was a fair and reasonable deduction from all the evidence as to the cause of the altercation at the beer tavern.

We are liberal in allowing counsel for both the state and defendant to present their arguments to the jury and it is only when they go outside of the record for the purpose of arousing passion and prejudice for or against the accused that such argument becomes improper. They are allowed to discuss the evidence and their reasonable and logical inferences and deductions from the evidence.

The other errors complained of by the accused are without substantial merit. The judgment and sentence of the district court of Pontotoc county is reversed and remanded, with instructions to again try the defendant in accordance with the views herein expressed.

BRETT, P. J., and POWELL, J., concur.